**Marlene Mary SMITH, Appellant (Defendant below),**

v.

**The STATE of Wyoming, Appellee (Plaintiff below).**

No. 4702.

Supreme Court of Wyoming.

June 1, 1977.

Rehearing Denied July 18, 1977.

Robert B. Denhardt, W. A. Smith & Associates, Lander, signed the brief and appeared in oral argument on behalf of appellant.

V. Frank Mendicino, Atty. Gen., and Arthur T. Hanscum, Asst. Atty. Gen., Cheyenne, signed the brief and Arthur T. Hanscum, Cheyenne, appeared in oral argument on behalf of appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

Appellant-defendant was found guilty by a jury in the district court, of second degree murder in violation of § 6–55, W.S.1957, and sentenced to a penitentiary term of not less than 20 nor more than 40 years. On appeal, defendant raises seven separate issues which, for the purposes of disposition, can be consolidated into five questions:

1. Did the trial court err in refusing to remove case from consideration by the jury and direct a verdict of acquittal or manslaughter?

2. Did the trial court err in refusing to admit psychological testimony concerning defendant's state of mind at the time of commission of the crime as well as her propensity to tell the truth?

3. Did the trial court improperly reinstruct the jury after they reported a deadlock?

4. Did the trial court err in refusing to give defendant's proffered instruction dealing with inferences to be drawn from her testimony?

5. Was the sentence imposed harsh, oppressive, and an abuse of discretion?

We shall affirm.

For some time prior to the incident involved herein, defendant and her husband

had been experiencing marital difficulties caused at least in part by Mr. Smith's less than clandestine relationship with the deceased, Dorothy Fancher. On the evening of November 13, 1975, Mr. Smith went bowling and when he had not returned by 3:30 a.m. of the morning of November 14, defendant went to see if his truck and the deceased's car were still parked in a bowling alley parking lot. Upon arrival, she observed that both vehicles were still parked as they were when she had first observed them at approximately 9:00 p.m. on the 13th while returning her daughter home from a girl scout meeting. Defendant then returned home, got her pistol, loaded it and returned to the parking lot. She parked beside her husband's pickup truck, facing the Silver Spur Motel, to wait for her husband and the deceased to emerge. At approximately 6:45 a.m. on November 14, the lights in the motel office came on. Defendant went to the office and asked what room her husband was in. The clerk told her, and she went to the door of that room. In response to her knocking, Mr. Smith answered. Defendant asked if the deceased, Dorothy Fancher, was inside; after first denying it, defendant's husband admitted she was there. Defendant asked to talk with both of them but her husband refused. He then closed the door to dress and upon reopening, became engaged with defendant in a rather heated confrontation outside the room. Defendant left the motel and, while returning to her car, saw the deceased drive from the parking lot and disappear down a street. While driving to her own home, defendant observed the deceased's car, turned and followed, catching her victim as she was walking from the car to her house. Defendant honked and motioned to the deceased to come over to the car where, after a brief verbal exchange, she fired one hollow point bullet into the upper thigh of the deceased at close range (an estimated four feet), the bullet exiting from the deceased's left lower back. After a few minutes, defendant knocked on the door of the deceased's house, was let in by the victim's mother and called the police. As a result of the gun shot wound, Dorothy Fancher died at approximately 12:00 noon on November 14, 1975.

At trial, defendant admitted having shot the deceased and that the death occurred as a result. Through counsel, she admitted her guilt to manslaughter. The sole argument asserted at trial by defendant was that she was guilty of manslaughter and not second degree murder, as charged.

Defendant alleges the trial court erred in refusing to remove the case from jury consideration and direct either a verdict of acquittal or manslaughter. At the close of the State's case in chief, defendant moved for a directed verdict of manslaughter, asserting that the State had failed to establish beyond a reasonable doubt the essential elements of second degree murder, i.e., purposely and maliciously. The trial judge denied this motion. Following the close of all the evidence, defendant again moved for a directed verdict of manslaughter, asserting there was no intent on her part to kill Ms. Fancher and that the killing occurred in a sudden heat of passion. That motion was also denied. Finally, following entry of the jury verdict, defendant moved for a judgment of manslaughter notwithstanding the verdict and, in the alternative, a new trial. That motion, as well, the trial court denied.

■ In view of the fact that defendant admitted having shot and killed the deceased, the only remaining issue at the close of the State's case was whether or not the evidence was sufficient to allow submission of the case to the jury with reference to the second degree murder elements of purpose and malice as opposed to manslaughter sudden heat of passion.[1] As stated in *State v. Spears*, 1956, 76 Wyo. 82, 118–119, 300 P.2d 551, 566:

> " * * * [W]hether a homicide is committed upon a sudden heat of passion or purposely and maliciously depends upon circumstances and conditions which the trier of fact is entitled to interpret. * * * "

1. Section 6–55, W.S.1957 (second degree murder); § 6–58, W.S.1957 (manslaughter).

**1198**

And if an "uncontrollable passion" is found, it is again for the jury to decide whether that passion brought about the purpose to kill or the purpose to kill brought about the uncontrollable passion. Verdicts of acquittal are directed only when in the trial court's opinion there is no substantial evidence to sustain the material elements of the crime charged. *Opie v. State*, Wyo. 1964, 389 P.2d 684. Reasonable doubt as to any disputed fact is for the jury, not within the province of the court, to draw.

█ The evidence in the case at bar, as recognized by even defense counsel on appeal, leans heavily toward malice and purpose, possibly even premeditation. Upon seeing that her husband's truck and deceased's car were both still parked in the proximity of a local motel at 3:30 a.m., defendant returned home, retrieved and loaded her gun, to then return to the motel to wait for her husband and the deceased to emerge. When they had not emerged by almost 7:00 a.m., the defendant went looking for them. When she found them, a heated argument ensued. After leaving the motel, defendant purportedly headed for home, yet by chance or otherwise, she ended up following the deceased to her home. Following a brief verbal exchange, one shot was fired. The motive beyond that shot was a question for the jury at trial to decide. We cannot now say that there was a lack of credible evidence upon which to base a decision.

█ Purposely denotes intent. Use of a deadly weapon gives rise to a presumption of intent to kill. *State v. Brierly*, 1973, 109 Ariz. 310, 509 P.2d 203; *Moser v. State*, 1975, 91 Nev. 809, 544 P.2d 424. The court in *State v. Greenwood*, 1967, 197 Kan. 676, 421 P.2d 24, held evidence that defendant, after argument with fiance, purchased revolver, returned and shot her between the eyes, creates an inference of malice and intent. The design to kill is inferred from the act of killing. *State v. Caryl*, Mont. 1975, 543 P.2d 389; *Grimes v. State*, Okl.Cr. 1961, 365 P.2d 739. Intent to kill may be presumed from evidence that a person has assailed another violently with a dangerous

weapon likely to kill, which presumption may be rebutted. *State v. Anstine*, 1966, 91 Idaho 169, 418 P.2d 210; see █ and 146, Homicide, West's Digest System. Malice may be inferred from the use of a deadly weapon in a dangerous and deadly manner if the facts and circumstances so allow. *Dodge v. State*, Wyo.1977, 562 P.2d 303; *State v. Bruner*, 1958, 78 Wyo. 111, 319 P.2d 863; *Eagan v. State*, 1942, 58 Wyo. 167, 128 P.2d 215. The circumstances here were clearly sufficient to allow such an inference. The trial court's denial of defendant's motion for acquittal following presentation of the State's case in chief was not error.

█ Such reasoning also supports the trial court's denial of defendant's motion for a directed verdict of manslaughter following the close of all evidence, as well as its denial of her motion for a judgment notwithstanding verdict of manslaughter, or in the alternative, new trial, following return of the jury verdict. A trial judge does indeed have a duty to determine if there is sufficient "credible and competent evidence" to support a jury's verdict. *O'Neal v. State*, Wyo.1972, 498 P.2d 1232; but that duty does not allow either this court nor any trial court to substitute its opinion for that of the jury. A jury's finding of fact or a judge's refusal to grant a new trial should not be interfered with if there is any substantial evidence to support it. *Reilly v. State*, Wyo.1972, 496 P.2d 899, reh. den. 498 P.2d 1236; *Murdock v. State*, Wyo.1960, 351 P.2d 674; *State v. Spears, supra*. The evidence presented here, viewed as it must be in the light most favorable to the State, more than adequately provides support for the trial court's denial of defendant's motion. *Johnson v. State*, Wyo.1977, 562 P.2d 1294. There was no error in the refusal of the court to take the case away from the jury.

█ At trial, defendant attempted to introduce, through the testimony of a psychologist, evidence concerning her state of mind at the time of the commission of the crime, as well as her propensity to tell the truth. In response to the State's objection

based upon improper foundation and invasion of the province of the jury, the trial court rejected the testimony on both points. Defendant asserts such rejection was error. The admission or rejection of expert testimony on a wide range of subjects is a decision solely within the sound discretion of the trial court; and that court's decision will only be reversed upon a showing of clear and prejudicial abuse. *Lee v. State*, Wyo.1976, 556 P.2d 217; *State v. Brewer*, Iowa 1976, 247 N.W.2d 205; *Terry v. State*, 1976, 34 Md.App. 99, 366 A.2d 65; *City of Sioux Falls v. Mini-Kota Art Theatres, Inc.*, S.D.1976, 247 N.W.2d 676; *Fennekohl v. United States*, D.C.App.1976, 354 A.2d 238; *Fotianos v. State*, Fla.App.1976, 329 So.2d 397; *State v. Andrade*, Mo.App.1976, 534 S.W.2d 595; *Schleiss v. State*, 1976, 71 Wis.2d 733, 239 N.W.2d 68. No clear showing of prejudicial abuse has been made here.

The proffered testimony of the psychologist did not concern areas, an understanding of which requires special expertise. The doctor as a basis for an opinion as to intent outlined a set of circumstances identical to the testimony that had been presented to the jury.[2]

■ Expert testimony is appropriate when the subject of inquiry is one which jurors of normal experience and qualifications as laymen would not be able to decide without the technical assistance of one having unusual knowledge of the subject by reason of skill, experience or education in the particular field. *Nelson v. Brames*, 10 Cir. 1957, 241 F.2d 256. See also *People v. Lawson*, Colo.App.1976, 551 P.2d 206, McCormick on Evidence, 2d Ed. 1972, § 13, pp. 29–31. The doctor had originally been detailed to determine whether the defendant was mentally competent to stand trial and aid in her defense; apparently she was. She did not interpose a defense of mental illness so mental capacity to commit the crime was not at issue.

■ The ultimate fact needed for a determination of the degree of the crime was the state of mind of the accused at the time of the shooting. Such a subjective conclusion must be found by the jury. The doctor could give jury members no more help than they already had from the facts. Under such circumstances, his conclusion was one which the jurors could draw for themselves. *Dawson v. State*, 1968, 84 Nev. 260, 439 P.2d 472. The province of the jury would have been involved and as in *Dawson* (a psychiatrist there), a psychologist is properly prevented from testifying. On the same basis, an alienist's opinion as to whether the killing was premeditated was held properly

2. The questions to and answers of the doctor, outside the presence of the jury by way of an offer, were:

"Q (By Mr. Smith) Doctor, based upon your personal interviews with the defendant Marlene Smith and the tests that you have given in your own personal investigation, have you arrived at a conclusion concerning the mental state of mind or the state of mind that the defendant [sic] at the time this incident occurred, the morning of November 14, 1975?

"A Yes, I have.

"Q Will you please state your opinion?

"A My opinion, on the morning of the alleged shooting, Mrs. Smith was in a state of mind that can best be described in layman's terms as being near hysterical. It can best be described as being near a total panic state. It has been brought about by the fact of her marriage was breaking up; that she had known her husband had been going out with another woman; and this was the confirmation of it. And I think at the time of the alleged shooting that she was a very, very delicate balance and did not really have control of her mental faculties.

"Q In your opinion, doctor, could she have formed the necessary intent, or could she, or did she form an attempt [sic intent] to shoot and kill Dorothy Fancher at that time?

"A It is my opinion, based upon the tests, personal interviews with her, that she, the morning of what we are questioning, November 14th, had no intent to kill or harm Mrs. Fancher.

"MR. TSCHIRGI: Well—

"THE COURT: Just a moment. He is in the middle of his offer. I don't know if he is finished yet.

"By Mr. Smith) Will you explain the basis for your opinion?

"A I have used as the basis for my opinion—to go back and perceive what Mrs. Smith has told me * * *."

The doctor then proceeded to outline the same evidence as before the jury.

excluded in *State v. Davis*, 1940, 6 Wash.2d 696, 108 P.2d 641.

 A doctor who was not a witness to the crime and does not have first-hand knowledge of a defendant's state of mind at the time of the offense, may not give his opinion as to what such mental state—intention—was. The state of mind of the accused is the proper subject for expert testimony when the defense is based on insanity but not when not based on such a plea. *State v. Craig*, 1973, 82 Wash.2d 777, 514 P.2d 151.

 The question of quilt or innocence involves legal principles upon which the court instructs the jury. *State v. Johnson*, Iowa 1974, 224 N.W.2d 617. In *Koester v. Commonwealth*, Ky.1969, 449 S.W.2d 213, the testimony of a psychiatrist that the defendant did not have a specific intent to have carnal knowledge, was held inadmissible as an expression of guilt or innocence on the very issue it was within the province of the jury to resolve. As we read the testimony of the doctor, outside the presence of the jury, which he would have given, if allowed, in the case before us, he would not have applied any scientific knowledge or any particular skill but was only using facts and circumstances and going through the same process as the jury would follow. His expression of opinion would only have been one of his belief how the question of intent should be decided. His testimony was properly excluded on the issue of intent.

 It would have been particularly improper to allow the doctor's testimony of defendant's veracity or propensity to tell the truth. An expert witness, cloaked in the garb of expertise, cannot testify as to the truthfulness of the defendant's version in that it assumes the function of the jury. *People v. Graydon*, 1974, 43 A.D.2d 842, 351 N.Y.S.2d 172. A defendant in a murder prosecution may not proffer testimony of a clinical psychologist intended only to buttress the credibility of the defendant as to his version of critical events; such a purpose would invite the trier of fact to abdicate its responsibility to ascertain the facts; traditionally, that is the function of the jury. *Commonwealth v. O'Searo*, 1976, 466 Pa. 224, 352 A.2d 30. Credibility of the defendant is a question for the trier of fact. *Bailey v. MacDougall*, 1968, 251 S.C. 290, 162 S.E.2d 177. Our jury system of jurisprudence is based on a belief in the ability of ordinary citizens to make this decision. They are the "experts" on truth. Refusal by the trial court of a psychologist's proffered testimony on that subject was not error.

After approximately 12 hours of deliberation,[3] the jury sent a note to the trial judge: "Hung jury 7–5, what should we do?" In response, the trial judge drafted in chambers, with all counsel present, and submitted to the jury, over defendant's objection, the following instruction:

"Ladies and gentlemen of the jury:

"You have advised the court that you believe yourselves to be a hung jury. Neither the court nor attorneys nor litigants will be able to perceive the magnitude of your difficulties, and will necessarily ultimately have to rely on your collective decision that a unanimous verdict cannot be reached, if that is to be your final disposition.

"Before concluding that you are at an impasse, you should consider that the case must at some time be decided; that you are selected in the same manner and from the same source from which any future jury must be selected. There is no reason to suppose the case will ever be submitted to 12 men and women more intelligent, more impartial or more competent to decide it.

"It is your duty to decide the case, if you can conscientiously do so."

The jury deliberated approximately three more hours following receipt of the instruction before a unanimous verdict of guilty of second degree murder was returned. De-

**3.** The record does not show the hour the jury started its deliberations but does show the note was sent out at about midnight. Defendant's counsel in her brief states the deliberations started out mid-day.

fendant alleges this "Allen-type" instruction was impermissibly coercive; that it had a "substantial propensity for prying individual jurors loose from beliefs they honestly have," *United States v. Thomas,* 1971, 146 U.S.App.D.C. 101, 449 F.2d 1177, 1182; and therefore reversal of her conviction is required.

■■■■ it is fundamental that whether in any case a so-called "Allen-type" instruction or modified version thereof is to be given rests initially in the sound discretion of the trial court. *Elmer v. State,* Wyo. 1969, 463 P.2d 14, reh. den. 466 P.2d 375, cert. den. 400 U.S. 845, 91 S.Ct. 90, 27 L.Ed.2d 82; *Goff v. United States,* 10 Cir. 1971, 446 F.2d 623. In a recent decision, this court discussed in some detail what would constitute a coercive abuse of that discretion. Communications from a judge to a jury are coercive when they possess the substantial propensity of prying minority jurors loose from beliefs they honestly have, constitute an undue intrusion into the jury's province and dilute the requirement of unanimity. *Hoskins v. State,* Wyo.1976, 552 P.2d 342, 347–348, reh. den. 553 P.2d 1390, citing *United States v. Thomas, supra.*

■■■■ We perceive no such coercion within the questioned instruction. Nothing within the instruction can be considered as intruding into either the jury's decisional province or diluting the requirement of unanimity. Informing a deadlocked jury that they are as competent as any other jury is not coercive. *Hoskins,* supra; *Kelley v. State,* 1971, 51 Wis.2d 641, 187 N.W.2d 810. Neither is a statement that the jury has a duty to decide the case nor

one that the case must at some time be decided. *Fulwood v. United States,* 1966, 125 U.S.App.D.C. 183, 369 F.2d 960, cert. den. 387 U.S. 934, 87 S.Ct. 2058, 18 L.Ed.2d 996. The instruction questioned herein does not (and need not) use the particular language of the 1968 Approved Draft of the American Bar Association of Standards Relating to Trial by Jury, which we approved in *Hoskins,* 552 P.2d at 346, as long as it does encompass the spirit and purpose of that standard. Minority opinions are not jeopardized. The emphasis is on the jury's collective decision. The timing of the instruction is not questioned and the record reveals no rush to a verdict following the instruction's submission, deliberation continuing almost three full hours following the jury's receipt of the instruction. From all these circumstances we are satisfied giving of the special instruction was not error.

■■■■ Defendant's final two arguments on appeal contain little substance and require only minor discussion. Defendant alleges the trial court erred in refusing her proffered instruction [4] dealing with inferences to be drawn from a defendant's testimony when the State relies upon the statements of the defendant alone for proof of intent. *Eagan v. State, supra.* While hinted at, the principles contained in defendant's rejected instruction did not correctly paraphrase the *Eagan* principle. The trial judge gave the instruction exactly as announced in *Eagan.*[5]

■■■■ Besides that, the State did not rely upon the statements and testimony of the defendant but independently proved intent by the circumstances of defendant re-

4. Defendant's refused Instruction A:

"You are hereby instructed that the Defendant in this case has made a statement to the State and has taken the stand in her own behalf, under such circumstances where the State must rely upon the statements of Defendant alone for the proof of intent for the commission of the crime of second degree murder, and other parts of her statement are consistent with her admission of guilt of the crime of manslaughter, you cannot accept such evidence in support of the charge of second degree murder and disregard the same as evidence of guilt of manslaughter."

5. Instruction 8:

"A defendant who wishes to testify, is a competent witness. A defendant's testimony is to be judged in the same way as that of any other witness.

"If a defendant is a sole witness of the transaction charged as a crime, her testimony cannot be arbitrarily rejected. If her credibility has not been impeached, and her testimony is not improbable, and is not inconsistent with the facts and circumstances shown but is reasonably consistent therewith, then her testimony should be accepted."

turning to her home to pick up a loaded handgun, pursuing her husband to the motel, her tracking down of the deceased victim, accosting and shooting her with a weapon likely to cause serious bodily injury or death. We question that the *Eagan* instruction should have been given at all. In a recent case, where the instruction was offered and refused, we held it not required when there is evidence other than the statements of the defendant which bring into question their credibility, make them improbable and are inconsistent with the facts shown. When the conditions of the *Eagan* instruction are not met, there is no mandatory requirement that the defendant's statements be accepted. *Raigosa v. State,* Wyo.1977, 562 P.2d 1009. The defendant could not have been prejudiced.

 Finally, defendant asserts the sentence imposed of not less than 20 nor more than 40 years in prison was not only harsh but oppressive, out of proportion with the crime committed and, as such, should be vacated as an abuse of discretion. As we have been required to point out previously, sentencing judges are vested with wide discretion in the determination of punishment and their determination, if within statutory limits, is not disturbed absent a clear abuse of discretion. *Hicklin v. State,* Wyo.1975, 535 P.2d 743; *Bentley v. State,* Wyo.1972, 502 P.2d 203. See also, *United States v. Donohoe,* 10 Cir. 1972, 458 F.2d 237, cert. den. 409 U.S. 865, 93 S.Ct. 157, 34 L.Ed.2d 113. While concededly a 40-year maximum term is a considerable period of time, it is not the maximum penalty which can be imposed for second degree murder. A sentence of life imprisonment is authorized by § 6–55, W.S.1957, and the imposition of such a maximum has been upheld. *Jaramillo v. State,* Wyo.1974, 517 P.2d 490. We perceive no sentencing abuse.

Affirmed.